### BELTON NAT. BANK v. ARMOUR & Co.*

(Circuit Court of Appeals, Fifth Circuit. February 20, 1926.)

No. 4561.

1. **Guaranty ⟐9—Correspondence from buyer, authorizing seller to draw drafts, held contract to guarantee payment of drafts, if intended to be communicated to bank discounting drafts.**

Letter and telegrams from buyer, relative to seller's drawing on them for certain percentage of shipments, *held* susceptible of construction that they were intended to guarantee payment of drafts drawn by seller, and, if intended to be communicated to bank discounting drafts, to constitute contract between it and buyer.

2. **Bills and notes ⟐87—Letter written within reasonable time before or after date of bill of exchange, promising to accept it, is binding, if shown to person who takes bill on credit of letter.**

Letter written within reasonable time before or after date of a bill of exchange, describing it in terms not to be mistaken and

*Certiorari denied 46 S. Ct. 630, 70 L. Ed. ——.

promising to accept it, is, if shown to person who afterwards takes bill on credit of letter, a virtual acceptance, binding person who makes the promise.

**3. Bills and notes ⬥⟹537(1)—Whether buyer intended that its letter and telegrams authorizing drafts were to be communicated to bank, which discounted drafts, held for jury.**

Evidence as to whether it was intention of buyer that letter and telegrams to seller, authorizing drafts, were to be communicated to bank, which discounted drafts, *held* sufficient for jury.

In Error to the District Court of the United States for the Western District of Texas; Charles A. Boynton, Judge.

Suit by the Belton National Bank against Armour & Co. and another, brought in the district court of Bell county, Tex., and removed as to defendant named to the District Court for the Western District of Texas. Judgment for defendant named, and plaintiff brings error. Reversed and remanded for new trial.

A. L. Curtis and Jas. B. Hubbard, both of Belton, Tex. (Tyler & Hubbard, of Belton, Tex., on the brief), for plaintiff in error.

Mark McMahon, of Fort Worth, Tex. (W. C. Kirk, of Chicago, Ill., and Capps, Cantey, Hanger & Short, of Fort Worth, Tex., on the brief), for defendant in error.

Before WALKER, BRYAN, and FOSTER, Circuit Judges.

FOSTER, Circuit Judge. Plaintiff in error, hereafter called plaintiff, brought suit in the district court of Bell county, Tex., against defendant in error, hereafter called defendant, and the firm of Bassel Bros., to recover on five certain drafts, aggregating $51,039.20, drawn by said firm on defendant and discounted by plaintiff, which defendant had refused to accept and pay. The suit as to defendant was removed to the District Court for the Western District, on the ground of diversity of citizenship and that the controversy was separable. At the close of the case, the District Court directed a verdict in favor of defendant. Error is assigned to this.

It appears that in the early part of November, 1922, Bassel Bros. entered into an agreement to ship to defendant their entire output of Thanksgiving turkeys, including outside purchases, on a consignment basis, defendant to receive 5 per cent. commission. Drafts were to be drawn for shipment for the value of the turkeys, less the commission and certain charges. This contract was car-

ried out with satisfaction to both parties. Later another agreement was made for what may be called Christmas turkeys, on the same basis, but with the change made by telegram that the drafts were to be drawn at a flat price of 40 cents per pound. This contract was also carried out with satisfaction, except as to the last five cars shipped. Some 17 cars were shipped under the first contract and 55 or 56 were shipped under the second. Negotiations for both of these contracts were had between Neal Bassel, representing his firm, and J. C. Orear, representing defendant. Prior to any shipment under the first contract, a letter was written to Bassel Bros. on November 8, 1922, signed Armour & Co., by J. C. Orear, the material part of which is this:

"Referring to our visit with you yesterday, it is now our understanding that you are arranging to give us your entire output of Thanksgiving turkeys on consignment basis, and that you are expecting to have at least 10 cars, including outside purchases. It will be satisfactory with us for you to draw for 80 per cent. of the market value of these turkeys date of shipment, using the regular Urner-Barry quotations on Texas stock as your guide. These drafts will be taken up upon presentation, providing cars have been inspected by our inspector. If it is necessary to ship any cars that cannot be inspected by us, drafts will be taken up on receipt and inspection of the car at destination. However, if you will keep Mr. Nickerson, of the Fort Worth office, closely advised as to where and when your cars are ready to ship, he will arrange to have inspector on the ground in plenty of time."

With regard to the second contract, there was an exchange of telegrams as to the amount to be drawn for, terminating with a telegram of December 6, 1922, which is as follows:

"Ar Union Stockyards Ills 1040 A Dec. 6 1922 Bassel Bros Belton, Tex. Answering while we would much prefer have you draw thirty eight on these drafts if absolutely necessary satisfactory draw forty give us as much advanced notice as possible on these cars now looks like market will be around fifty fifty two do not want to see it go too high                    J C Orear"

Neal Bassel testified in substance that his firm was engaged in the produce business in 1922, and during that year they handled some 75 or 76 cars of turkeys through Armour & Co., amounting in value to between $800,000 and $1,000,000, all of which were inspected before shipment; that Orear, rep-

resenting defendant, came to Belton, where his firm was doing business, about November 5th, and they arranged for the shipment of turkeys; that in the course of his conversations, before the letter of November 8th was written, he had a discussion with Orear as to whether he could finance the handling of the turkeys, and he asked Orear about a bank guaranty, and was told by him, "Well, Bassel, we can give you a bank guaranty, but we can give you a guaranty by Armour & Co., which is bigger than any bank, and you can take this to the Belton National Bank, or any other bank, and do business with them, and get any amount of money you want;" that at that time he was unable to finance the business without the aid of a bank and that he discussed that with Orear; that on receiving the letter of November 8th he called on Mr. James, president of the Belton National Bank, and asked him if he could finance the transaction, and told him that all the cars would be inspected by Armour & Co., as to quality and as to what they had agreed to do. After the receipt of the telegrams on the December business, he showed them to James and explained his agreement. James corroborates Bassel as to the exhibition of the letter and telegrams to him as president of the plaintiff, and also testifies his bank bought the drafts on the faith of the guaranty by Armour & Co. Orear denies that Bassel asked him for a bank guaranty, and denies that he told him he would give a written promise to pay the drafts on presentation, that he could take to the bank.

[1, 2] The letter and telegrams above quoted are susceptible of the construction that they were intended to guarantee the payment of Bassel Bros.' drafts drawn on defendant. If they were intended to be communicated to plaintiff, they constitute a contract between it and defendant to pay drafts drawn by Bassel Bros., and would have the same effect as a more formal letter of credit. In Coolidge v. Payson, 2 Wheat. 66, 4 L. Ed. 185, the Supreme Court said this: "Upon a review of the cases which are reported, this court is of opinion that a letter written within a reasonable time before or after the date of a bill of exchange, describing it in terms not to be mistaken, and promising to accept it, is, if shown to the person who afterwards takes the bill on the credit of the letter, a virtual acceptance binding the person who makes the promise." The doctrine thus announced has been followed in numerous cases, and we regard it as the law applicable to this case. See, also, Border Nat.

Bank v. Am. Nat. Bank (C. C. A.) 282 F. 73.

[3] With regard as to whether it was the intention of defendant that its letter and telegrams were to be communicated to plaintiff there was material conflict in the evidence, sufficient to go to the jury with proper instructions, and it was therefore error to direct a verdict in favor of the defendant. It follows that the judgment must be reversed, and the case remanded for a new trial.

Reversed.